IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Cael Technologies (Pvt.) Ltd., <br><br> Plaintiff, <br><br> v. <br><br> PRECISE VOTING, LLC., <br> PRECISE VOTING, LLC., <br> VOTRITE, LLC. <br><br> Defendants. | ECF Case <br><br> Civil Case No. _____ <br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S COMPLAINT

Cael Technologies Private Ltd. ("Plaintiff" or "Cael Technologies") asserts this Complaint against Precise Voting, LLC, a New York corporation; Precise Voting, LLC, a Delaware corporation (both Precise Voting, LLCs collectively "Precise Voting"); and VotRite LLC ("VotRite") (collectively "Defendants"), pleading as follows:

### PARTIES

1. Plaintiff Cael Technologies is a corporation organized and existing pursuant to the laws of India having its principal place of business at 501 Keizan Heights, Lane No. 2, Uma Nagar, Begumpet, Hyderabad, India.

2. Plaintiff was established in 2002 and is in the business of providing customized software applications, software product development and other software products and services.

3. Upon information and belief, Defendant Precise Voting is a New York limited liability company, formed on or about March 2006.

4. Upon information and belief, Defendant Precise Voting is also a Delaware limited liability company, formed on or about August 2011.

5. Upon information and belief, at all times herein mentioned Defendant Precise Voting has maintained its principal place of business in Nassau County at 219 Mineola Blvd., Suite 2, Mineola, New York 11501.

6. Upon information and belief, Defendant Precise Voting is in the business of manufacturing and marketing electronic voting machines and services in the United States.

7. Upon information and belief, Defendant VotRite is a Delaware limited liability company, formed on or about January 2007, with authority to do business in New York.

8. Upon information and belief, at all times herein mentioned, Defendant VotRite has maintained its principal place of business in Nassau County at 14 Ridge Road, Albertson, New York 11507. Defendant VotRite also operates under the fictitious name of VotRite Rentals LLC.

9. Upon information and belief, Defendant VotRite is a wholly owned subsidiary of Defendant Precise Voting and is a provider of electronic voting machines and services, including rentals, in the United States.

10. Upon information and belief, Defendants' business of electronic voting machines and services caters to both government and private organizations.

## NATURE OF THE ACTION

11. This is an action for copyright infringement in violation of the copyright laws of the United States, 17 U.S.C. §§ 101 *et seq.*, as amended (the "Copyright Act").

12. This Complaint alleges that Defendants have infringed Plaintiff's copyright in Voting Systems Software for which the Indian Copyright Office issued Certificate of Registration No. VA 1-786-057.

2

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in so far as it raises questions under the law and treaties of the United States and 28 U.S. § 1338(a), in so far as it raises questions under copyrights.

14. This Court has personal jurisdiction over defendants by virtue of their transacting and doing business in the State and Eastern District of New York.

15. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## FACTS

16. Plaintiff designs and develops computer programs and the source codes on which the programs operate for various Indian and multinational clients.

17. On or about early 2005, Plaintiff was approached by an Indian company, SSW Information Technology Services Private Limited ("SSWITS" or "WITS India"), to develop an electronic voting machine system to be marketed worldwide, including in the United States, through the WITS Group Inc. of companies ("WITS Group").

18. The WITS Group was responsible for identifying and negotiating with potential buyers of the voting system in the U.S. Upon information and belief, at that time, the WITS Group included, at least one corporation based in New Jersey.

19. On or about May 2005, Plaintiff entered into an agreement with WITS India for the development of a functional voting machine prototype for the U.S. market that complied with U.S. voting regulations ("WITS India Agreement"). Upon information and belief, this venture was an entirely new line of business for the WITS Group.

20. The proposed prototype would include both software, to be developed by Plaintiff, ("Cael Software") and hardware and was made solely for marketing and demonstration purposes and not for sale. The proposed prototype was going to be the basis for future commercial production of the final product to be called Advanced Electronic Voting System ("AEVS"). Plaintiff referred to this new voting system as "the VotRite" system and it was contemplated to be commercialized by a new affiliate company of Plaintiff to be called by the same name, "VotRite."

21. On or about the same time, Plaintiff also entered into an agreement with an Indian company, Analogic Technomatics Private Limited ("Analogic"), for building the hardware box (housing the display screen, printer, ballot box and such other components) for the AEVS prototype exclusively for Plaintiff and based solely on Plaintiff's specifications ("Analogic 2005 Agreement").

22. On or about June 28, 2005, pursuant to the WITS India Agreement, Plaintiff delivered the functional AEVS prototype (the hardware box built by Analogic and containing the Cael Software therein) to the WITS Group in New Jersey. WITS India paid for the AEVS prototype machine as required under the agreement. WITS India, however, failed to make the additional and agreed upon payment for the design and development of the software.

23. Plaintiff subsequently delivered four more functional prototypes between approximately late 2005 and August 2006 pursuant to purchase orders placed by the WITS Group. The WITS Group paid for these prototypes and Plaintiff delivered these prototypes in New Jersey.

24. The functional AEVS prototypes designed and delivered by Plaintiff worked as intended. All the prototypes were solely for demonstration purposes to potential investors and not for sale.

25. Plaintiff spent considerable time, effort, expense, and expertise to create the unique Windows-based voting software for the U.S. market that complied with U.S. voting regulations under the Help America Vote Act of 2002.

26. Pursuant to the WITS India Agreement and consistent with its standard practice, Plaintiff Cael Technologies retained all rights in the software and source code developed for the AEVS prototype but could later transfer those rights to WITS India at a mutually agreed consideration.

27. No further agreement was ever entered between Plaintiff and WITS India for transfer of Plaintiff's rights in the AEVS prototype's software and/or source code.

28. Plaintiff applied to register the copyright in the software and source code for the AEVS prototype in India, and on May 9, 2008, the Indian Copyright Office issued Certificate of Registration No. SW-3861/2008 entitled "Cael Voting Systems Software" (referred throughout this document as "Voting Systems Software" or "Cael Software") that effectively registered Plaintiff's claim to copyright in the works.

29. The copyrighted work was first published in India in 2005. A copy of the Certificate of Registration No. SW-3861/2008 is attached as **Exhibit A**.

30. Plaintiff, at all times relevant herein, has been and continues to be the sole owner of the copyright in the Cael Voting Systems Software.

31. On or about September 2006, after the functional AEVS prototypes were delivered, Plaintiff entered into an agreement with Analogic for manufacture of a close-to-

production AEVS prototype which would be matured to a production unit ("Analogic 2006 Agreement"). As before, pursuant to this agreement, the software was exclusively developed by Plaintiff and the hardware was provided by Analogic based solely on Plaintiff's specifications.

32. Pursuant to the Analogic 2006 Agreement, Plaintiff incorporated the Cael Software into the AEVS prototype that was provided by Analogic and gave it to Analogic for completing and/or fine-tuning the hardware work. Analogic, however, failed to subsequently deliver the close-to-production AEVS prototype to Plaintiff.

33. On or about the same time in late 2006, Plaintiff, the WITS Group, and Analogic were in discussions for manufacture of final production AEVS prototypes but the parties had a falling out.

34. On or about early 2007, Plaintiff grew suspicious about Analogic and WITS India's dealings in India. Plaintiff cautioned WITS India against using or reengineering its copyrighted Cael Voting Systems Software through Analogic or anyone else.

35. Plaintiff further initiated arbitration proceedings against Analogic in July 2007 in India for breach of the Analogic 2006 Agreement and to prevent Analogic from exploiting its copyrighted software. An interim injunction was granted against Analogic and material evidence seized from Analogic, including hard drives, flow charts etc.

36. On or about August 2012, Plaintiff was given the confidential report of the Andhra Pradesh Forensic Science Laboratories (an official government agency of the Indian State of Andhra Pradesh) by the Hon'ble Arbitrator. That report concluded that the Analogic hard drives seized by the Indian court contained Plaintiff's copyrighted Cael Voting Systems Software.

37. On or about late 2012, Plaintiff started investigating the U.S. voting machines market. Plaintiff became aware of Defendants Precise Voting and VotRite and that the Defendants were marketing an electronic voting system very similar or identical to Plaintiff's Voting Systems Software.

38. Upon information and belief, Defendant Precise Voting had access to Plaintiff's copyrighted Voting Systems Software through Analogic and/or the WITS Group. Defendant Precise Voting admits that through Bright Software Development, Inc., it had decompiled the source code, originally developed by an Indian programmer, for use in its voting machines. A copy of the online article is attached as **Exhibit B**.

39. Upon information and belief, the voting machines marketed by Defendant Precise Voting in the United States have the same major features as found in Plaintiff's copyrighted Voting Systems Software, including a Windows-based system, language selection, voice guidance, and void vote print.

40. Upon information and belief, the voting machines marketed by Defendant Precise Voting in the United States have the same acronym as that of Plaintiff's proposed prototype product – "AEVS."

41. Upon information and belief, Defendant Precise Voting formed a subsidiary company by the same name as that proposed by Plaintiff – VotRite.

42. Upon information and belief, Defendant Precise Voting copied, decompiled, and/or modified Plaintiff's copyrighted Voting Systems Software and registered it as its own software with a very similar title "Voting Machine Software."

43. Upon information and belief, Defendant VotRite had access to Plaintiff's copyrighted Voting Systems Software through Defendant Precise Voting.

44. Upon information and belief, Defendants Precise Voting and VotRite have made and will continue to make substantial revenues by selling, renting or otherwise marketing their voting machines made by copying Plaintiff's Voting Systems Software.

45. Plaintiff Cael Technologies never gave permission to any entity to use, modify, decompile, market, or exploit its copyrighted Voting Systems Software.

## FIRST CAUSE OF ACTION
### (Copyright Infringement of a Literary Work: Software)

46. Plaintiff Cael Technologies incorporates the allegations set forth in paragraphs 1 through 45 as though set forth herein.

47. The Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention") Article 5(1) provides that "Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specifically granted by this Convention."

48. Article 5(2) of the Berne Convention further provides that "(t)he enjoyment and exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work."

49. Both the United States and India are signatories of the Berne Convention.

50. The United States Copyright Act of 1976 ("Copyright Act") extends copyright protections in the United States to "literary works," including computer programs. 17 U.S.C. § 102(a).

51. As the owner of the copyrighted work, Plaintiff Cael Technologies has the exclusive right to reproduce, distribute, market and prepare derivative works of the copyrighted material, pursuant to 17 U.S.C. §§ 101 and 106.

52. Defendants have infringed and continue to infringe Plaintiff's exclusive rights under the Copyright Act by making unauthorized copies of the Cael Software; by preparing and developing unauthorized derivative software, code or other work from and on the basis of the Cael Software; and/or by unauthorized making, marketing, distributing and selling of voting machines incorporating such software, code or other works.

53. Defendants have engaged in and continue to engage in infringing activities in derogation of Plaintiff Cael Technologies' rights.

54. Upon information and belief, Defendants' infringing activities are and were willful and intentional inasmuch as Defendants were or should have been aware, and knew or should have known, that their acts constituted infringements of Plaintiff's copyright in Cael Voting Systems Software.

55. The infringement of Plaintiff's copyright by Defendants has caused and will continue to cause substantial and irreparable harm to Plaintiff's business and Plaintiff's ownership rights in and market for the Cael Voting Systems Software.

56. As a further consequence of the foregoing, Defendants have and will continue to derive illegal profits at Plaintiff's expense from the marketing, renting, sale or other exploitation of the infringing copies of Cael Software.

57. As a result of the unauthorized conduct set forth above, Plaintiff Cael Technologies is entitled to: (i) a permanent injunction prohibiting Defendants' further access to, copying, making derivatives, marketing, selling, distribution, or other commercial exploitation of

the Cael Voting Systems Software or any derivatives of the Cael Voting Systems Software or the voting machines incorporating any such software; (ii) to an order of destruction or other disposition of all copies of the Cael Voting Systems Software or any derivatives of the Cael Voting Systems Software heretofore made by Defendants and whether standing alone or incorporated in any machine, DVD, CD or other storage media; (iii) to recover from Defendants the actual damages suffered by Plaintiff as a result of Defendants' infringements and all of Defendants' profits attributable to Defendants' infringements of Plaintiff's copyright in the Cael Voting Systems Software, or statutory damages, and enhanced damages for willful infringement]t; and (iv) to an award of Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees incurred.

58. Unless enjoined by this Court, Defendants Precise Voting and VotRite will continue to infringe Plaintiff's copyright and cause irreparable harm to Plaintiff.

59. Plaintiff Cael Technologies is without an adequate remedy at law.

## JURY DEMAND

WHEREFORE, Plaintiff Cael Technologies seeks a trial by jury on all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Cael Technologies seeks a judgment against Defendants Precise Voting and VotRite that provides for:

A. A permanent injunction against Defendants and all persons acting in concert or participation with them or persons purporting to act on their behalf, including but not limited to their subsidiaries, affiliates, parent corporation(s), officers, directors,

stockholders, partners, owners, agents, employees, representatives, successors and assigns and any and all persons acting in concert or privity with them, directing Defendants to:

    a. Cease and desist from infringing Plaintiff's copyright in the Cael Voting Systems Software by in any way copying, making derivatives, distributing, selling, marketing, or otherwise commercially exploiting the Cael Voting Systems Software or its derivatives or the voting machines or other devices incorporating such software.

    b. The issuance of an order for the seizure and impoundment of all copies of the Cael Voting Systems Software or any derivatives of the Cael Voting Systems Software, in whatever machines, devices or form such copies may be incorporated in or stored, in Defendant's possession, custody or control;

B. The filing with this Court and service upon Plaintiff within 30 days following service of the injunction order, a report, in writing and under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction;

C. An award of damages that Plaintiff has sustained as a result of Defendants' unlawful infringements together with defendants' profits derived from such infringements, the total amount to be determined at trial and awarded jointly and severally against Defendants, or any statutory damages within the provisions of the Copyright Act, including any enhancement of damages for willful infringement;

D. An award to Plaintiff of interest on any judgment, plus the costs and attorney fees incurred in this action;

E. Such other and further relief as the Court deems just, equitable and proper.

DATED: New York, New York

March 15, 2013

 

Padmaja Chinta
Henry Cittone
Cittone & Chinta LLP
11 Broadway, Suite 615
New York, NY 10004
Tel: 212-710-5619
Fax: 212-624-0244
pchinta@cittonechinta.com
hcittone@cittonechinta.com

Adam Finkel
Sabharwal & Finkel, LLC
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: 212-601-2882
Fax: 212-601-2883
adam@sabharwalandfinkel.com

*Attorneys for Plaintiff*

# EXHIBIT A

Phone   : 27071357, 27073205, 27071660
Telefax : 040-27071660
e-mail  : raoandrao@rediffmail.com

# RAO & RAO

**Patents, Trademarks, Designs & Copyright Registration Consultants**

12-10-651/3, Road No. 2, Indira Nagar, Warasiguda, Secunderabad-500 061. A.P.

Ref:CR:L: 4231 :2008-09                                    28.05.2008

M/s Cael Technologies (P) Ltd
6 - 3 - 668/10/20/1, 1st Floor
Durga Nagar Colony
Punjagutta
Hyderabad-500 082.
Sir,

      Sub:  Copyright – Original certificate in respect of
              "CAEL TECHNOLOGIES (P) LTD" along with
              the work enclosed – reg

We enclose herewith the original certificate along with the work in respect of your software work **"CAEL TECHNOLOGIES(P)LTD"** bearing **No. A-38612008 dt. 09.05.2008** registered under the Copyright Act, 1957 for safe custody.

Please acknowledge the receipt.

Thanking you,

Yours faithfully
Rao & Rao

(K.Hemaprakasa Rao)
Advocate & Attorney

Encl: as above.

---

**BRANCHES:**

HYDERABAD : Room. No. 6, 3rd Flr, Twincities Market Complexs, Opp. Troop Bazar Lane, Abids, Hyderabad-500 001.
Ph : 040-24735852, 66105852, 66105853

VIJAYAWADA : G-6, Sri Sai Vista Apts., Mayor T.V. Rao Street, Maruthinagar, Eluru Road, Vijayawada. Ph : 0866-2436286

# Government of India
# Copyright Office
# Extracts from Register of Copyrights



Dated: 09/05/2008

| | | |
|---|---|---|
| 1. | Registration No: | SW-3861/2008 |
| 2. | Name, address and nationality of the applicant: | CAEL TECHNOLOGIES (P) LTD<br>6 - 3 - 668/ 10/ 20/ 1, 1ST FLOOR, DURGA NAGAR COLONY, PUNJAGUTTA, HYDERABAD - 500 082<br>INDIAN |
| 3. | Nature of applicant's interest in the copyright of the work | OWNER |
| 4. | Class and description of the work | SOFTWARE |
| 5. | Title of the work: | CAEL VOTING SYSTEMS SOFTWARE |
| 6. | Language of the work: | C#, .NET, MYSQL |
| 7. | Name, address and nationality of the author and if the aouthor is deceased, date of his decease: | LOKIREDDY RAJSHEKAR REDDY, LOKIREDDY S.S REDDY & 3 OTHERS<br>(1) 'SURYA', PLOT NO. 443 & 27, ROAD NO. 86, JUBILEE HILLS, HYDERABAD - 500 033.<br>INDIANS |
| 8. | Whether the work is published or unpublished: | PUBLISHED |
| 9. | Year and country of the first publication and name, address and nationality of the publisher: | 2005 INDIA<br>SAME AS IN COL.2 ABOVE |
| 10. | Years and countries of subsequent publications, if any, and names, addresses and nationalities of the publishers: | NIL |
| 11. | Names, addresses and nationalities of the owners of various rights comprising the copyright in the work and the extent of rights held by each, together with particulars of assignments and licences, if any: | SAME AS IN COL.2 ABOVE |
| 12. | Names, addresses and nationalities of other persons, if any, authorised to assign or licence of rights comprising the copyright: | NIL |
| 13. | If the work is an Artistic work, the location of the original work, including name, address and nationality of the person in possession of it. ( In the case of an architectural work, the year of completion of the work should also be shown) | N.A. |
| 14. | Remarks:<br>Diary No.  7310/2007-CO/SW<br>Date of Application: 31/10/2007<br>Date of Receipt: 22/11/2007 | |

DEPUTY REGISTRAR OF COPYRIGHTS



# EXHIBIT B



**Case Study**



www.precisevoting.com

## A New Electronic Voting Machine Enters the Race

*Precise Voting Able to Deliver their New Voting Machine Prototype on Time*

Precise Voting is one of the lead contenders for supplying accurate, auditable, and secure electronic voting machines for the State of New York. New York State is currently accepting entrants, such as Precise Voting, as long as they meet their specifications—and their phased deadlines. A deadline was fast approaching when Precise Voting's lead developer in India suddenly "disappeared," leaving mid-project. Bright Software stepped in and was able to salvage the source code—and not only helped Precise Voting meet their deadline, but helped them build a better voting machine that more accurately reflected their expert knowledge of the voting process.

---

### Solution-At-A-Glance

**Company:** Precise Voting

**Industry:** Electronic Voting Machines

**Problem:** Lead developer in India "disappeared" mid-project as approval deadlines were fast approaching.

**Solution:** Salvage previous developer's source code and augment software to meet and exceed NY State requirements.

**Products and Technologies:**
- MS Visual Studio 2005 C#
- My SQL Database

**Timeframe:** 2 weeks then 2 months for enhancements

**Business venture saved:** Precise Voting, by meeting a deadline, is still an entrant to win the contract to supply NY State with electronic voting machines.

---

### The Challenge: Rebuild the Software Source Code in Time

With their lead programmer gone, Precise Voting "Googled" the Web for a new developer, and found Ray D'Andrade, owner, Bright Software Development. Even before meeting face to face, it was clear while talking on the phone that the future of the project depended on the ability to obtain the existing software source code.    "I agreed to help, if I could, but I really wouldn't know how to help until I got my hands on the software. The previous developer didn't leave the original source code, only a compiled version, which doesn't allow you to change the functionality," says D'Andrade.

Jim Kapsis, General Partner of Precise Voting, gave whatever files he had over to D'Andrade and hoped for the best. Kapsis faced a New York State deadline in which they required source code—something he didn't have. As it turns out, D'Andrade was able to decompile the

executable (.exe) file given to him and, much like a detective, piece together the missing software logic so Precise Voting could meet their deadline in two weeks' time.

"Business people often call on me to help them rescue a project after a lead programmer has left. Sometimes the program is so poorly written it's cost-prohibitive for a client to have me (or anyone else) spend time trying to fix all the flaws—but in this case I was able to help," says D'Andrade. He adds, "Be careful who you hire to do your software development and always ensure that you have the software rights and a copy of the original source code."

**More Software Enhancements—So Even the Blind and Deaf Can Vote Anonymously**
Meeting the deadline meant Precise Voting was still in the race to supply voting machines for New York State. Kapsis was happy, but the voting machine software was far from complete. "Ray helped us in a jam and I knew I could then trust him to take us to the next level," says Kapsis.

> **" Ray helped us in a jam and I knew I could trust him to take us to the next level. "**

Developing an electronic voting system is a difficult technical challenge. The system must be secure, private, reliable, auditable, portable and publicly accessible—all while maintaining a voters' anonymity.

Precise Voting relied on D'Andrade to interpret their on-going requirements and make them a reality. A voting machine was sent to D'Andrade, so he could access the machine prototype first-hand and he was able to help the hardware team resolve a problem they struggled with for months.

The voting machine uses touch screens, but also provides other voting options for the hearing, sight, and otherwise physically impaired.

In four weeks, Precise Voting had many of the new features they needed:

- The ability to choose and have the machine speak via a headset in 4 languages.
- Voice recognition when a voter speaks.
- A working "sip and puff" plastic mouthpiece tube by which to cast votes and a "head mouse" by which someone can use their head to move the screen cursor without use of their hands.
- An auditable printed paper trail to supplement each electronic vote which is verified visually by the voter.
- Encryption and hashing to secure all voting results for transportation to Board of Elections Offices where votes are counted.
- A management console that enables districts to create new ballots and provide a means of updating each voting machine.
- Finally, as you'd expect from a voting machine, but it was missing: a central vote counting system to tally all votes, verify their accuracy, and report on the results.

"It was a wonderful experience for me to put so much in place for one product. I've worked with helping the blind before, but this product had to try to accommodate the whole voting public—some with very specific needs," says D'Andrade.

Kapsis knows he can rely on D'Andrade to help him move his voting machine software ahead as requirements are added and more deadlines approach. He adds, "I only wish I had found Ray sooner."

---

Visit **www.brightsoftware.com/experience** to read more about Bright Software's accomplishments.

---

© 2007 Bright Software Development, Inc. All rights reserved. All products mentioned are marks of their respective owners. 02.07